# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CHARLES KAMINSKI,

       Plaintiff,

v.

UNITED STATES OF AMERICA,

       Defendant.

Case No. 14-2630-DDC-JPO

## MEMORANDUM OF DECISION

In February 2013, several winter storms passed through northeast Kansas, blanketing the area with heavy snowfall.[1]  This same month, plaintiff Charles Kaminski slipped and fell on a sidewalk outside a post office in Bonner Springs, Kansas.  He sustained injuries to his right arm and shoulder.  Mr. Kaminski brought this negligence lawsuit against defendant, the United States of America, seeking to recover damages for his injuries under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

After a trial to the court beginning on July 18, 2017, and ending on July 20, 2017, the case now is ready for decision.[2]  After considering the evidence and arguments presented at trial, the court makes the following findings of fact and conclusions of law, as Rule 52 requires.  *See* Fed. R. Civ. P. 52(a)(1) (requiring a court to state its findings of fact and conclusions of law in

---

[1]    *See* Joe Robertson, *Winter's Crushing Blow Levels Snow-Weary KC Area*, The Kansas City Star (Feb. 26, 2013, 12:38 p.m.), http://www.kansascity.com/news/local/article315262/Winter%E2%80%99s-crushing-blow-levels-snow-weary-KC-area.html (reporting that snow storms on February 21 and February 26 produced "total snowfall amounts ranging from 16 to 25 inches" in the Kansas City metro area); *see also February 25–27, 2013 - Second Winter Storm Hits Northeast Kansas*, National Weather Service, https://www.weather.gov/top/2013_February25Snow (last visited November 28, 2017) (reporting that "[o]ver the past week, 2 powerful winter storms pummeled Northeast Kansas.").

[2]    FTCA claims are tried by the court without a jury.  28 U.S.C. § 2402.

"an action tried on the facts without a jury").  In sum, the court concludes that Mr. Kaminski has failed to meet his burden to prove a negligence claim under the FTCA.  The court thus enters judgment for defendant.  The court explains the reasons for its decision, below.

I.    **Findings of Fact**

On an early morning in February 2013, Mr. Kaminski drove to the post office in downtown Bonner Springs, Kansas, stopping to mail some letters before heading to work.  Mr. Kaminski testified that it was cold outside that morning, but clear.  Mr. Kaminski recalled that no snow or ice was falling that morning, and the streets outside the post office were clear.  Mr. Kaminski arrived at the post office shortly after 5:00 a.m.  It was dark when he arrived.

The United States Postal Service's ("USPS") postal facility ("Post Office") in Bonner Springs, Kansas, is located at the intersection of East Second and Cedar Streets.  East Second Street borders the Post Office on the northwest side, and Cedar Street borders it on the southwest side.  The front of the Post Office runs parallel with Cedar Street.  There are four angled, off-street parking spaces located on the East Second Street side of the Post Office.  A public sidewalk runs between the off-street parking spaces and the northwest wall of the Post Office.  A free-standing letter collection box is located near the corner of East Second and Cedar Streets.  It stands to the southwest of the four angled parking spaces between East Second Street and the Post Office building.

When Mr. Kaminski arrived at the Post Office, he parked his pick-up truck in the third or fourth parking space moving away from the corner of East Second and Cedar Street.[3]  Mr. Kaminski testified that he did not park in one of the spaces closer to the collection box because he saw broken concrete on the ground in one of those spaces.  After parking, Mr. Kaminski left

---

[3]    Mr. Kaminski testified that he parked where the black car is parked on Exhibits 48-1 and 48-2, or maybe one spot to the north.

his truck through the driver's side door and walked in front of his truck.  He intended to walk down the sidewalk to the collection box at the end of the street so that he could mail his letters.  While still standing in the street, Mr. Kaminski noticed a small ridge of snow piled along the curb line and another ridge of snow piled up against the other side of the sidewalk, *i.e.*, against the Post Office building.  He also saw that someone had shoveled a path about three feet wide in between the two snow piles.  Mr. Kaminski stepped over the snow closest to the curb and onto the sidewalk.  He slipped on the sidewalk immediately, falling on his right arm, right elbow, and right side.  Mr. Kaminski testified that he fell to the ground so hard that he thought he had hit his head.  Mr. Kaminski then rolled over on his stomach, got to his hands and knees, and crawled to the street where he was able to regain his feet.  He testified that the sidewalk was so slippery that he could not stand on it.  But, he testified, he was able to stand in the street.

Once on his feet, Mr. Kaminski heard some noise coming from the back of the Post Office building.  He walked back there and saw Matt Lowe, a postal employee, standing outside the building.  Mr. Kaminski told Mr. Lowe that he had slipped and taken a "hard fall" on the sidewalk.  He also told Mr. Lowe that the Post Office should do something to treat the slippery conditions on the sidewalk.  Mr. Lowe never asked Mr. Kaminski if he was hurt or injured by the fall.  But, likewise, Mr. Kaminski never told Mr. Lowe that he had injured himself.

After this conversation, Mr. Kaminski walked back down the street to the collection box.  He mailed his letters, walked in the street back to his truck, and then drove on to work.  He worked at a Honeywell facility located on Bannister Road in Kansas City, Missouri—about 30 miles from the Bonner Springs Post Office.[4]

---

[4]     Neither party offered evidence about the distance of this drive.  But, the court views it as the kind of fact subject to judicial notice.  *See, e.g.*, *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007) (invoking Fed. R. Evid. 201 and taking judicial notice of distance).  In any event, the court includes it merely to provide some context about an undisputed fact.

Mr. Kaminski worked his complete work shift the day of the fall, ending about 3:00 p.m. On his way home from work, Mr. Kaminski drove to the Post Office again. He went inside, asked to speak with the manager, and he met Officer-in-Charge ("OIC") Roy Sanderson. Mr. Kaminski told Mr. Sanderson that earlier that morning he had slipped and taken a hard fall on the ice outside of the Post Office and asked whether the Post Office had taken care of the icy conditions. Mr. Kaminski never told Mr. Sanderson that he had sustained any injuries from the fall. And, Mr. Sanderson never asked Mr. Kaminski if he had hurt himself in the fall. Outside the Post Office, Mr. Kaminski observed ice melt on the sidewalk. He also noticed that someone had placed one or two plastic placards on the sidewalk. Mr. Kaminski would not remember what was on the placards, but he compared them to one that a custodian might use to mark a wet floor.

Mr. Kaminski then went home. He showed his wife his injured arm. It was black and blue. He treated his arm at home with ice and ibuprofen. But, Mr. Kaminski did not seek medical treatment for his injuries for several more months. On March 12, 2013, Mr. Kaminski had an appointment with his family physician to treat a sinus infection. He never mentioned that he had sustained injuries from a fall in February during this doctor visit. Mr. Kaminski testified that he did not tell his doctor about his injuries from the fall because he thought they would improve. But, when they did not, he made an appointment with Dr. Prem Parmar, an orthopedic surgeon. On June 3, 2013, Mr. Kaminski had his first visit with Dr. Parmar. This was the first medical treatment Mr. Kaminski had sought or received for injuries he sustained in the fall.

### *Date of Mr. Kaminski's Fall*

The parties sharply dispute the date when Ms. Kaminski fell outside the Post Office. This fact is complicated by both parties' omissions and errors in reporting the date of the fall. These errors begin early in the timeline. On the day Mr. Kaminski fell, no one at the Post Office

4

recorded the date or made a report about it. But, in 2013, USPS required employees to report all injuries involving non-postal employees on Post Office premises. USPS also required that a postal facility's manager or supervisor report all accidents and occupational injuries and illnesses in the Employee Health and Safety System ("EHS") within 24 hours of the event. To make the report, the USPS employee must input information into EHS, and EHS then generates an accident investigation worksheet (Form 1700) and accident report (Form 1769).

Matt Lowe—the employee who Mr. Kaminski had spoken with minutes after he fell— testified that he never prepared a written report about Mr. Kaminski's fall. He told OIC Roy Sanderson about the complaint, however, and they agreed to "take care" of the sidewalk before the Post Office opened that morning. Mr. Lowe testified about his brief conversation with Mr. Kaminski about the fall on the morning it happened. Mr. Lowe explained he had just arrived at work. He had seen Mr. Kaminski's truck parked in the parking space as he walked to the building to begin his work day. It was dark outside, and Mr. Lowe recalls that snow was covering the ground. Mr. Lowe also testified that he was unlocking the door to go into the Post Office when Mr. Kaminski approached him. Mr. Kaminski told him that he had fallen on the sidewalk on the northwest side of the building. Mr. Lowe testified that he responded by saying that he'd take care of the slippery conditions when he had time.

Mr. Lowe also testified at trial that he believes the fall happened on February 27, 2013— which was a Wednesday. Mr. Lowe readily conceded, however, that he testified at his deposition that the fall occurred on a Monday. But, at trial, he testified that he knows today that the fall did not happen on a Monday. He explained the basis for his conclusion in this fashion: In 2013, Mr. Lowe's scheduled hours required him to arrive at work at 5:15 a.m. on Tuesdays through Saturday. But his scheduled called for him to arrive at 4:00 a.m. on Monday. When Mr.

Kaminski reported the fall to Mr. Lowe, he just had arrived at work. Mr. Lowe's time records appear to support his testimony. On Wednesday, February 27, Mr. Lowe clocked into work at 5:04 a.m. But, on Monday, February 25, Mr. Lowe clocked in at 4:20 a.m.

Mr. Sanderson also failed to make a written report about Mr. Kaminski's fall on the day it occurred. Mr. Sanderson recalled that Mr. Kaminski came to the Post Office on the afternoon of his fall to complain, but Mr. Sanderson did not know that USPS policy required him to report the complaint. In June 2013, Mr. Kaminski and his wife returned to the Post Office to make another complaint about his fall in February. Mr. Sanderson again received Mr. Kaminski's complaint. After speaking to Mr. Kaminski in June, Mr. Sanderson called another postal employee to ask for instructions about how to handle the complaint. The employee directed him to contact Safety Specialist Kathreen Bollinger. On June 11, 2013, Mr. Sanderson submitted an accident report form by providing information about the accident to Ms. Bollinger. Mr. Sanderson did not have any notes or other written documentation about the accident to refer to when he talked to Ms. Bollinger. Mr. Sanderson relied only on his memory for the information he reported to Ms. Bollinger.

Adding to the confusion, two Post Office reports prepared in June 2013 recite that Mr. Kaminski's fall happened in December 2012. The June 11, 2013 Form 1700 accident report lists the accident date as December 21, 2012. Likewise, the June 11, 2013 Form 1769 accident report provides the same date as the date of the accident. Ex. 30 at 1. And, the Form 1769 recites that Mr. Kaminski's fall occurred "[i]n December 2012, around the 21st, or the last big snow storm during that month . . . ." *Id.* at 2. Mr. Sanderson testified that he provided this date as his best estimate. He did not base this date on any notes he took or any information that Mr. Kaminski

had provided him.  Mr. Sanderson believes the fall occurred on December 21, 2012, because he

remembers that it was a bad week of snow and ice.

Not to be outdone, Mr. Kaminski's written reports add their own layer of confusion.  Mr.

Kaminski first identified the date of his fall as February 27, 2013, when he filed an

administrative claim with USPS.  On December 7, 2013, more than nine months after the fall,

Mr. Kaminski completed and signed a Standard Form 95.  In Box 6 of that form, Mr. Kaminski

asserted that his fall occurred on February 27, 2013.  Mr. Kaminski also wrote a written narrative

he attached to the form.  It specified that the fall occurred "on or about February 27, 2013."  Ex.

57 ¶ 19.  Some 18 months after he fell, on December 19, 2014, Mr. Kaminski filed his Complaint

in this lawsuit.  Doc. 1.  His Complaint also identifies the date of his fall as February 27, 2013.

*Id.* ¶ 8.

When Mr. Kaminski sought medical treatment for his injuries, he provided other dates.

On a patient information form prepared for Dr. Parmar, Mr. Kaminski identified the date of his

injury as "mid-winter."  After their visit, Dr. Parmar recorded that Mr. Kaminski had fallen

around February or March of 2013.  Later, Mr. Kaminski reported to his physical therapist that

he'd fallen in January 2013.  To highlight the vague dates Mr. Kaminski gave to medical

providers about his fall, the government introduced Mr. Kaminski's medical records from 2008,

when he sustained a knee injury.  On his patient information form for that knee injury, Mr.

Kaminski provided the exact date of his injury—December 23, 2008.

Mr. Kaminski testified at trial that he realized he had provided the incorrect date of his

fall when he was reviewing his personal calendar.[5]  He knew that February 25 was the correct

date because he had taken vacation days at the end of the previous week and was returning to

---

[5]     At trial, Mr. Kaminski referred to his personal calendar as a Day Timer.

work the morning of February 25.  On July 31, 2015, Mr. Kaminski served responses to defendant's interrogatories that—for the first time—identified the date of the fall as February 25.

 As described above, the Post Office's employees failed to report Mr. Kaminski's fall on the day that it happened.  And, when Mr. Sanderson finally made the report, he estimated the date of the fall using nothing more than his memory.  Although the Post Office's reporting provides a poor model for accurate and timely reporting of accidents, it's equally true that they provided no evidence to support Mr. Kaminski's position that he fell on February 25.  Instead, considering all the evidence presented at trial, the court finds that Mr. Kaminski fell on Wednesday, February 27, 2013.  This finding requires the court to decide an important factual question, and on evidence that is not clear or one-sided.  But, after carefully reviewing the evidence, the court finds the fall occurred on February 27 for several reasons.[6]

*First*, Mr. Kaminski's testimony about the date of the fall was not as credible as Mr. Lowe's.  Mr. Kaminski provided differing explanations about what caused him to remember that that the date of the fall was not February 27, but instead February 25.  Mr. Kaminski testified on cross-examination that he made this discovery when reviewing his personal calendar.  Mr. Kaminski first testified that he was reviewing his calendar because he was calculating the vacation days that he already had taken so that he could determine how many vacation days he had left.  But this explanation doesn't make much sense.  Mr. Kaminski made the date change in 2015—some two years after his fall.  Mr. Kaminski never provided a plausible reason why he would review his vacation days from 2013 to determine how much vacation leave he had two years later in 2015.  In any event, on redirect examination, Mr. Kaminski provided yet another reason how he discovered the actual date of his fall.  His counsel showed him written discovery

---

[6] As shown in Part II.C. below, it also doesn't matter here which date Mr. Kaminski fell.  The court concludes that Mr. Kaminski failed to establish at trial that the Post Office breached a duty to make the sidewalks safe for pedestrian travel on either February 25 or 27.

that defendant had served in this lawsuit. One of the requests for production of documents asked Mr. Kaminski to provide "all personal notes, logs, diaries, letters, summaries, or other documents" prepared by Mr. Kaminski that refer to his allegations in the Complaint. Ex. 43 ¶ 16. Mr. Kaminski then explained that he discovered that he had provided the wrong date of his fall when he was reviewing his personal calendar as part of his obligation to respond to defendant's discovery in July 2015.

On cross examination, defendant's counsel suggested that Mr. Kaminski had changed the date of his fall after learning information about the weather conditions on February 27. But, Mr. Kaminski denied that he changed the date of his fall for this reason. The court cannot conclude from the evidence that Mr. Kaminski purposefully changed the date he fell to a different date with weather conditions more favorable for the merits of his claims—and a date that would preclude defendant from asserting certain defenses. After considering all the evidence, the court concludes that Mr. Kaminski genuinely was confused about the date of his injury.

Mr. Kaminski provided the February 27 date in his administrative claim and in his Complaint in this lawsuit. He says he realized this was the wrong date after he reviewed his personal calendar. But the only evidence to corroborate the February 27 date is Mr. Kaminski's memory that he had taken vacation days at the end of the previous week. And, he contends that his fall occurred on his first day back to work from those vacation days—on Monday, February 25. But Mr. Kaminski's personal calendar also shows that he took a vacation day on Tuesday, February 26. So, he also was returning to work after a vacation day on Wednesday, February 27.

Still, the court finds that Mr. Lowe's testimony about the date of the accident is more credible. Mr. Lowe had a specific recollection of the times he observed Mr. Kaminski and his

truck at the Post Office, and when they spoke with one another. And Mr. Lowe's work schedule and time records are consistent with the timeline he provided in his testimony.

*Second*, the court observed other instances at trial when Mr. Kaminski's testimony conflicted with other witnesses. For example, Mr. Kaminski's orthopedic surgeon testified that after he performed surgery on Mr. Kaminski's shoulder, one of the discharge instructions he gave Mr. Kaminski directed him to wear a sling on his right arm for three weeks, post-surgery. At a follow-up appointment with Dr. Parmar, Mr. Kaminski arrived not wearing the sling. Dr. Parmar reminded Mr. Kaminski of his discharge instruction and told him that he must wear the sling as he had ordered. At trial, Mr. Kaminski testified that he had spoken with someone from Dr. Parmar's office before his appointment and that person told him that he didn't need to wear the sling to his appointment. Dr. Parmar testified, however, that he has a small staff who assists him with administrative tasks and none of them provide medical advice to patients over the phone. In short, Dr. Parmar denied that anyone on his staff would have told Mr. Kaminski over the phone not to wear his sling to his appointment. And, Dr. Parmar testified, Mr. Kaminski never told him during that appointment that the reason he wasn't wearing his sling was because someone on the staff had told him not to wear it. Dr. Parmar said he would have remembered that had Mr. Kaminski told him that information.

Also, two days after his appointment with Dr. Parmar, Mr. Kaminski's physical therapist recorded in the treatment notes that Mr. Kaminski had reported that he had been wearing his sling at all times since his operation. This statement contradicts both Mr. Kaminski and Dr. Parmar's testimony that Mr. Kaminski was not wearing his sling two days earlier during his appointment with Dr. Parmar.

Mr. Kaminski also contradicted other disinterested witnesses. For example, his testimony about his job duties at Honeywell conflicted with his supervisor's testimony. Mr. Kaminski testified that he rarely performed overhead work and that he never worked with equipment overhead. But, Craig Chillcutt, Mr. Kaminski's supervisor at Honeywell from early 2012 through May 2014, disagreed. Mr. Chillcutt testified that although Mr. Kaminski's written job requirements did not include overhead work, he sometimes performed overhead work as part of his job duties. Mr. Chillcutt estimated that Mr. Kaminski spent 25 to 50% of his time reaching overhead. Also, Mr. Chillcutt provided specific testimony that made his testimony believable. He explained that Mr. Kaminski's job required him to test sensors in ovens, and sometimes those sensors were placed above the head. So, according to Mr. Chillcutt, Mr. Kaminski had to reach overhead to test the sensor.

These other examples of conflicting testimony demonstrate that Mr. Kaminski may have had confusion or an inability to remember details as precisely as others. This limitation provides another reason that Mr. Kaminski's testimony about the date of his fall is not as credible as Mr. Lowe's testimony on that question. In sum, based on all the evidence presented at trial, the court finds that Mr. Kaminski's fall occurred on Wednesday, February 27—the original date that Mr. Kaminski specified as the date he fell.

### *Treatment of Sidewalks*

In 2013, the Post Office did not use a private contractor to remove snow and ice from the sidewalks adjacent to the Bonner Springs Post Office. Instead, Mr. Sanderson directed employees to clear the sidewalks and apply ice melt whenever snow or ice was present. He never assigned snow removal duties to any particular employee. Also, Mr. Sanderson testified, no written snow removal policy existed for the Post Office in Bonner Springs.

Mr. Sanderson and Mr. Lowe both testified that they had cleared snow and ice on the sidewalks as part of their job duties.  Both employees testified that they would clear a path in the snow wide enough for pedestrian travel—about 3 feet wide, they estimated.  They would pile snow up alongside the edge of the Post Office building.  And, then, they would apply ice melt to the sidewalk they had cleared to create this path.  Mr. Lowe usually performed this snow removal about 9:30 or 10:00 a.m., before he'd leave from his morning shift.  Mr. Lowe recalled shoveling snow frequently in February 2013, because heavy snow had fallen in Bonner Springs during that month.  Mr. Lowe testified that the sidewalk was safe for pedestrian travel when he left work on Saturday, February 23.

Mr. Lowe also testified that that he cleared snow off of the sidewalk later in the morning of the day when Mr. Kaminski told him he had fallen.  But, Mr. Lowe remembered, he finished his mail sorting duties first.  This took him a couple of hours.  Mr. Lowe also testified that it was about 7:00 a.m. when he went outside to clear the sidewalk.  He saw that snow had covered the ice melt he previously had applied to the sidewalk.  He testified that if snow was covering the sidewalk, it would have fallen overnight.

### Water Flowing from the Northwest Downspout

The Post Office has a rear parking lot located on the north side of the building.  A downspout is located on the northwest corner of the building.  Next to the downspout is a curb separating the parking lot from the sidewalk bordering East Second Street.  The rear parking lot was designed with a slope to make water drain away from the building, along the curb bordering the East Second Street sidewalk, and into a driveway connecting East Second Street and the rear parking lot.  The water then traveled southwest along the street to the storm sewer located near the collection box located at the corner of East Second and Cedar Streets.

12

Sometime in early 2012, Kenneth Welborn, the building's landlord,[7] noticed that the curb bordering the rear parking lot and the East Second Street sidewalk was crumbling. He saw concrete debris near the curb, and he swept it up because he thought it was a tripping hazard. Mr. Welborn also hired a contractor to grind the curb down and pour fresh concrete over it. The project was completed around February 2012. USPS neither requested nor authorized Mr. Welborn to complete this project. Also, Mr. Welborn had no discussions with USPS about the project. After the project's completion, water flowing from the northwest downspout would flow around the curb and onto the sidewalk.

Mr. Kaminski hired David Nelson, a licensed professional engineer, to evaluate the conditions on the property outside the Post Office. Mr. Nelson observed that the curb bordering the rear parking lot and the East Second Street sidewalk was disintegrating. He testified that disintegration of the kind he found is caused by exposure to water. That water came from the northwest downspout on the building. The water exposure caused the curb to disintegrate and the sidewalk to crack. *See* Exs. 33-B, 33-D. The sidewalk joint nearest to the end of the curb had significant cracking and erosion. *See* Ex. 33-B. The next sidewalk joint to the southwest had no similar cracking or erosion. *Id.* Mr. Nelson testified that this damage proved that water flowed to the first sidewalk joint and then drained down the joint into the street.

Mr. Kaminski conceded that he does not know how the ice formed on the sidewalk that caused his fall. He testified that he did not look at the northwest downspout on the day he fell. Instead, he testified only that the sidewalk was a solid sheet of ice.

---

[7]     USPS leases the building that houses the Post Office in Bonner Springs from Kenneth and Jean Welborn. The lease agreement requires the landlord to perform maintenance and make repairs to the premises. The lease agreement makes USPS responsible for snow and ice removal from sidewalks, driveways, parking areas, and any other areas providing access to the Post Office. Ex. 52.

## *Other Complaints of Ice Accumulation at the Post Office*

On March 25, 2013, OIC Roy Sanderson reported a problem of ice forming in the back parking lot of the Post Office building.  He asked for investigation or repair of the gutters on the roof at the back of the building.  Mr. Sanderson testified that this problem involved ice accumulating in the rear parking lot—not on the sidewalk where Mr. Kaminski fell.  Mr. Welborn testified that he investigated this complaint.  He looked inside the gutters and saw that ice had formed inside them.  The ice was causing water to back up in the gutters and drain over the side of the roof.  Mr. Welborn cleared the gutters of the ice, correcting the problem reported by Mr. Sanderson.

USPS employee Aletta Dickson reported icy conditions on the sidewalk outside the Post Office on January 26, 2011.  She asked someone to investigate the rain gutter on the building's east side because water and ice were traveling onto the walkway used by customers.   Ms. Dickson recalled that the landlord came to the Post Office and looked at the issue.  She could not remember what the landlord did, if anything, but she thought the issue was resolved.  Ms. Dickson identified the area where she had reported the ice was forming in 2011.  Ex. 33-A. Also, during her deposition, she marked a photograph to show the direction of the water flow. Ex. 49.  Both of the markings she made show the water flowing around the curb separating the rear parking lot from the sidewalk bordering East Second Street and then onto the portion of the sidewalk near the driveway to the rear parking lot.  Exs. 33-A, 49.  Ms. Dickinson also testified that the problem area was close to the driveway's apron.  After Ms. Dickson reported the ice problem in 2011, USPS employees kept the area safe as best as they could by applying ice melt to the sidewalk.

*Weather in February 2013*

The following chart lists the high and low temperatures and precipitation recorded for relevant dates in Bonner Springs, Kansas:

| __Date__ | __High__ | __Low__ | __Precipitation__ |
|----------|----------|---------|-------------------|
| Wednesday, Feb. 20, 2013 | 25° | 15° | None |
| Thursday, Feb. 21, 2013 | 26° | 20° | 9.5 inches of snow, ending at 8:00 p.m. |
| Friday, Feb. 22, 2013 | 29° | 4° | None |
| Saturday, Feb. 23, 2013 | 32° | 4° | None |
| Sunday, Feb. 24, 2013 | 48° | 9° | None |
| Monday, Feb. 25, 2013 | 37° | 29° | Trace snow, starting at 4:00 p.m. |
| Tuesday, Feb. 26, 2013 | 34° | 29° | 5.5 inches of snow |
| Wednesday, Feb. 27, 2013 | 36° | 28° | 5.0 inches of snow, ending at 11:00 a.m. |

## II.    Conclusions of Law

Mr. Kaminski asserts a negligence claim against the United States under the FTCA.  The FTCA provides a limited waiver of the United States' sovereign immunity, "making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment."  *Lopez v. United States*, 823 F.3d 970, 975–76 (10th Cir. 2016) (quoting *United States v. Orleans*, 425 U.S. 807, 813 (1976)); *see also* 28 U.S.C. § 1346(b).  The FTCA holds the United States liable for negligent or wrongful acts or omissions to the same extent that a "private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

Here, "the act or omission occurred" in Kansas.  28 U.S.C. § 1346(b).  So, the court applies Kansas law to Mr. Kaminski's negligence claim.  *See Mahaffey v. United States*, 785 F. Supp. 148, 150 (D. Kan. 1992) (applying Kansas law to a negligence claim brought under the FTCA because Kansas was the location where the alleged negligence occurred).  To prevail on a negligence claim in Kansas, a plaintiff must establish:  (1) the existence of a duty, (2) breach of that duty, (3) injury, and (4) a causal connection between the duty breached and the injury sustained.  *Smith v. Kan. Gas Serv. Co.*, 169 P.3d 1052, 1057 (Kan. 2007) (quoting *Schmidt v. HTG, Inc.*, 961 P.2d 677, 693 (Kan. 1998)).

After considering all the evidence presented at trial, the court concludes that Mr. Kaminski has not carried his burden to establish each element of a negligence claim.  The court reaches this conclusion for several reasons.  It explains these reasons, below.

**A.  The Kansas Winter Storm Doctrine Precludes Mr. Kaminski's Claim.**

Our court has held that "Kansas follows the majority rule that a property owner, absent a statutory provision to the contrary, owes no duty to persons to keep abutting public sidewalks free from natural accumulations of ice and snow."  *Collins v. Am. Drug Stores, Inc.*, 878 F. Supp. 182, 186 (D. Kan. 1995) (citing *Wilson v. Goodland State Bank*, 611 P.2d 171, 173 (Kan. Ct. App. 1980)).  In *Collins*, the plaintiff alleged that he slipped and fell on ice that had formed on a sidewalk outside of the defendant's store in Kansas City, Kansas.  *Id.* at 183.  But, "[t]he City of Kansas City, Kansas [had] no municipal code or ordinance that impose[d] a duty on landowners to remove ice or snow from public sidewalks abutting their property."  *Id.*  So, Judge Lungstrum granted summary judgment for the defendant because the plaintiff produced no evidence that he had slipped on anything other than a natural accumulation of ice.  Kansas law, Judge Lungstrum

16

held, imposed no duty on the defendant to remove natural accumulations of ice from a public

sidewalk. *Id.* at 186.

But, the facts here differ from *Collins*. The Bonner Springs Municipal Code includes an

ordinance requiring property owners to remove snow and ice from adjacent sidewalks. It

provides:

> To allow for safe pedestrian travel, it shall be unlawful for a
> property owner immediately adjacent to a public sidewalk to fail to
> cause the removal of snow or ice accumulated within 48 hours
> after cessation of a snow and ice event. If ice has accumulated to
> an extent to make removal difficult, the placement of sand or ice
> melt within the 48 hour period shall be deemed in compliance with
> the provisions of this Section.

Bonner Springs Municipal Code § 14-106(a) (2014),

http://ks-bonnersprings.civicplus.com/index.aspx?nid=328.[8] So, here, defendant owed a duty of

ordinary care to remove snow and ice from public sidewalks in a fashion complying with the

Bonner Springs Municipal Code. But, defendant asserts that it never breached this duty because

the Kansas Winter Storm Doctrine shields it from any liability based on events occurring on

February 27, 2013.

In Kansas, "a business proprietor, absent unusual circumstances, does not breach the duty

of ordinary care by not removing snow or ice from outdoor surfaces during a storm and a

reasonable time thereafter." *Agnew v. Dillons, Inc.*, 822 P.2d 1049, 1054 (Kan. Ct. App. 1991);

*see also Jones v. Hansen*, 867 P.2d 303, 311 (Kan. 1994) (adopting *Agnew*'s holding because it

is supported by "sound public policy"). In *Agnew*, the Kansas Court of Appeals concluded that

"[a] requirement that a business proprietor continually expend effort, during a winter storm, to

remove frozen precipitation from outdoor surfaces would essentially be a requirement to insure

---

[8]     The court cites the current version of the ordinance as it is available online. Both parties
reference this same text of the ordinance. The court thus concludes that this ordinance was part of the
Bonner Springs Municipal Code in effect in 2013, when Mr. Kaminski fell outside the Post Office.

the safety of invitees and is a burden beyond that of ordinary care." 822 P.2d at Syl. ¶ 3. *Agnew* also recognized that "invitees using or traversing outdoor areas should be aware of the weather and its probable effect on those surfaces." *Id.* at 1054 (quoting *Walker v. The Memorial Hospital*, 45 S.E.2d 898, 907 (Va. 1948) ("[E]very pedestrian who ventures out at such time knows he [or she] is risking the chance of a fall and of a possible injury.")).

The plaintiff in *Agnew* entered the defendant's store during an ice storm while ice was accumulating on a ramp located outside the defendant's store. *Id.* at 1051, 1054. When the plaintiff left the store, he slipped on the ramp and fell to the ground. *Id.* at 1051. Under these facts, the Kansas Court of Appeals held, the district court did not err by directing a verdict for the defendant. The court of appeals explained, "reasonable minds could not conclude either that the storm had ended or even that a reasonable time had passed after the cessation of the storm to activate [the defendant's] duty to remove the accumulated ice from the ramp." *Id.* at 1054. Other courts have applied this doctrine as well, each holding that the defendant had not breached a duty of care to remove snow and ice accumulation when a winter storm is ongoing. *See Hayes v. Kit Mfg. Co.*, No. 98-3063, 1999 WL 969271, at *2 (10th Cir. Oct. 25, 1999) (applying Kansas law and affirming summary judgment against plaintiff's claim of negligent failure to remove ice or snow because the undisputed facts established that a winter storm was ongoing when plaintiff fell and thus, under *Agnew*, defendant had not breached its duty of ordinary care); *see also Childs v. Goodland Econ. Lodging, Inc.*, No. 106,583, 2012 WL 2149818, at *3 (Kan. Ct. App. June 8, 2012) (affirming summary judgment against plaintiff's negligence claim because defendant had no duty "to clear . . . outdoor surfaces of nearly 17 inches of blowing snow between 3 a.m. and 4 a.m." and also no duty "to warn [the plaintiff] that the exterior stairway would likely be slick").

Similar facts exist here.  The credible trial evidence establishes that a winter storm was in progress on February 27, 2013, when Mr. Kaminski fell shortly after 5:00 a.m.  The storm began about 8:00 p.m. on February 25, and ended around noon on February 27.  Ex. 17 ¶ 2.  Except for brief interludes, the snow fell continuously during the storm and deposited about 10.5 inches of snow in the Bonner Springs area.  *Id.*  Between 5:00 p.m. on February 26 and 5:00 a.m. on February 27, at least two inches of snow fell in Bonner Springs.  *Id.*  So, defendant failed no duty of care because it did not remove the snow and ice from the sidewalk outside the Post Office.  A winter storm was ongoing when Mr. Kaminski fell.  Mr. Kaminski produced no evidence of "unusual circumstances" that would obviate the Kansas Winter Storm Doctrine.  The court thus concludes that the doctrine bars Mr. Kaminski's negligence claim.

### B.  Defendant Never Breached a Duty to Remove Snow From the Sidewalk.

Even if the Kansas Winter Storm Doctrine did not preclude liability, Mr. Kaminski also has failed to prove that defendant breached a duty to remove the snow and ice that accumulated overnight, before Mr. Kaminski fell around 5:00 a.m. on February 27.  Mr. Kaminski argued that two sources imposed a duty on defendant to remove the snow:  (1) the Bonner Springs Municipal Code; and (2) the USPS lease agreement with the Welborns.

As stated above, the Bonner Springs Municipal Code requires property owners to remove snow and ice "within 48 hours after cessation of a snow and ice event."  Bonner Springs Municipal Code § 14-106(a).  When Mr. Kaminski fell shortly after 5:00 a.m. on February 27, a snow event was in progress.  More than five inches of snow had fallen on February 26—the day before Mr. Kaminski fell.  And, five more inches of snow fell on February 27, with that snowfall ending about noon—roughly five hours after Mr. Kaminski's fall.  So, defendant had not violated the city ordinance by failing to remove the snow and ice before Mr. Kaminski fell.

Instead, defendant had 48 hours after the snow storm ended to comply with the ordinance by removing snow and ice from the adjacent sidewalks. And, the evidence at trial established, defendant complied with the ordinance. Mr. Lowe testified that he shoveled snow and applied ice melt to the sidewalk after Mr. Kaminski had reported his fall to him. He estimated that he did so around 7:00 a.m. that morning—though the snow continued to fall for most of the morning. Mr. Kaminski also testified that he saw plastic placards and ice melt on the sidewalk when he returned to the Post Office that afternoon to complain to OIC Roy Sanderson about this fall. The court concludes that defendant never breached its duty under the Bonner Springs Municipal Code to remove snow and ice.

At trial, Mr. Kaminski also argued that defendant breached a duty of care owed to him under the USPS's lease agreement with the Welborns. It is undisputed that the lease agreement makes USPS responsible for snow and ice removal from sidewalks outside the Post Office. Mr. Kaminski asserted that this agreement created a duty owed to him as a third-party beneficiary of the contract, *i.e.*, to keep the sidewalks clear of snow and ice. The court disagrees. First, the duty created by the lease agreement is a duty that defendant owed to the Welborns, as the other contracting party. Second, even if the lease agreement created a duty that defendant owed to Mr. Kaminski as a third-party beneficiary, the duty owed to him is one of ordinary care. *Beecher v. Ritchie*, 205 P.2d 1014, 1018 (Kan. 1949) (holding that a defendant's duty in a negligence case is determined "by the law governing negligence cases and not by the provisions of the contract" that defendant entered with a third party). As earlier portions of this Order have concluded, defendant satisfied its duty of ordinary care under both Kansas common law and the Bonner Springs Municipal Code. Mr. Kaminski presented no evidence establishing that the lease agreement intended to impose a heightened duty to remove snow and ice during a winter storm

that was continuing when plaintiff sustained his injury.  For all these reasons, the court concludes that the evidence fails to establish that defendant breached a duty of ordinary care to remove snow and ice from the sidewalks on February 27.

### C.  Mr. Kaminski's Other Theories of Liability Fail to Prove Negligence.

Mr. Kaminski also argued that defendant breached a duty to remove snow and ice from the sidewalks and thus caused his fall in two ways.  First, Mr. Kaminski alleged that he fell on ice that formed when temperatures rose and snow melted from piles that USPS employees had shoveled up against the northwest side of the building.  He argued that defendant's failure to remove that ice was a breach of the duty imposed on it by both the Bonner Springs Municipal Code and the lease agreement with the Welborns.  Second, Mr. Kaminski alleged that he slipped and fell on ice that had formed when water drained from the Post Office's northwest downspout and onto to the sidewalk.  Mr. Kaminski argued that defendant created a dangerous condition where the sidewalk could become icy and that this dangerous condition caused his fall.  The court disagrees, and the following sections explain why.[9]

### 1.  Defendant Never Breached a Duty to Remove Snow and Ice from Melting Snow Piles.

Mr. Kaminski testified that when he arrived at the Post Office on an early February morning in 2013, he saw a path about three feet wide on the sidewalk where someone had shoveled and piled snow creating two snow banks.  One of the snow banks was a small ridge of snow piled along the curb line; the other snow bank was piled up against the Post Office building.  So, the evidence established that defendant had removed snow from the sidewalks after the snow storm in Bonner Springs on February 21, 2013.  Mr. Lowe also testified that the sidewalk was safe for pedestrian travel when he left work on Saturday, February 23.  Over the

---

[9]    This conclusion applies whether Mr. Kaminski fell on February 25 or 27.  The evidence at trial failed to prove a negligence claim for a fall on either date.

weekend, though, temperatures rose.  On Sunday, February 24, the temperature reached a high of 48 degrees.  Mr. Kaminski asserted that when the temperatures rose above freezing, it caused the snow stacked against the building to melt.  The water from the melting snow piles then ran over the sidewalks toward the street, but refroze later that evening when the temperature dropped below freezing.  Mr. Kaminski argued that defendant was negligent for failing to remove the ice that had formed after defendant's employees had shoveled the sidewalk and created snow piles that later melted.

The court has found no Kansas law imposing a duty on a business owner to remove ice formed by melting snow that melted outside of normal business hours.  Indeed, a Kansas case with similar facts held that a municipality holds no such duty.  In *Lumbley v. City of Coffeyville*, the plaintiff slipped on a patch of ice outside the City Hall building in Coffeyville, Kansas.  No. 90,877, 2004 WL 324428, at *1 (Kan. Ct. App. Feb. 20, 2004).  When the plaintiff fell, she was walking to work about 7:55 a.m.  *Id.*  Some three weeks before the plaintiff fell, a snow storm had produced a significant amount of snowfall in Coffeyville.  *Id.*  Afterward, the city experienced smaller amounts of snowfall on several other occasions, including a snowfall of one to two inches about three or four days before the plaintiff fell.  *Id.*  The day before the accident, Coffeyville recorded four to five inches of accumulated snow.  *Id.*  A few days before the fall, a city employee removed snow from the sidewalks creating a path about 3 feet wide.  *Id.*  The employee piled the shoveled snow on both sides of the sidewalks.  *Id.*  In the days before the plaintiff's fall, the evidence suggested that the snow in these piles had melted and then refrozen overnight, creating patches of ice on the sidewalks.  *Id.*  The plaintiff filed suit against the City of Coffeyville, alleging her fall was caused by the City's negligence.  *Id.*

The Kansas Court of Appeals affirmed the district court's decision to grant summary judgment against the plaintiff's claim. It concluded that the defendant owed plaintiff no duty. *Id.* at *4. The court of appeals first explained that the Kansas Supreme Court has held that:

> The general rule with respect to snow and ice is that municipal corporations are not held liable for injuries to persons occasioned by accumulations of snow and ice, which at the time of the accident have been so recent that in the exercise of that reasonable and continuing inspection which the law requires it would not have discovered it in time to remedy it by the exercise of reasonable care.

*Id.* at *2 (quoting *Speakman v. Dodge City*, 22 P.2d 485, 488 (Kan. 1933)). In *Speakman*, the Kansas Supreme Court also observed, "when [icy] conditions exist generally they are obvious, and everyone who uses the sidewalks at such times is on his guard, warned by the surroundings and the danger of slipping at every step." 22 P.2d at 486. "To hold otherwise would cast upon cities a burden for which they are not responsible and greater than their ability to provide for." *Id.*

Following the Kansas Supreme Court's reasoning in *Speakman* and the Kansas Court of Appeals' holding in *Agnew*, *Lumbley* concluded that the same rule applied to the plaintiff's fall in Coffeyville. The court held: "[T]he City was under no duty to clear the sidewalk absent sufficient notice and a reasonable opportunity to remedy the situation." *Lumbley*, 2004 WL 324428, at *3 (citing *Agnew*, 822 P.2d at 1052 (interpreting *Speakman*, 22 P.2d at 488)). The *Lumbley* court concluded that the summary judgment facts established neither sufficient notice nor a reasonable opportunity to remedy the situation. First, the court held, the City lacked sufficient notice of the ice so as to create a duty. *Id.* The ice had formed overnight, and the plaintiff fell about 7:55 a.m. *Id.* So, "[a]t the time of the accident, the formation of the ice patch that caused [the plaintiff's] fall was so recent that even in the exercise of the reasonable and continuing inspection that the law requires, the City would not have discovered the ice patch in

time to remove it." *Id.* Second, the court held, "even if the City knew patches of ice were forming overnight," it "was allowed a reasonable opportunity to remove the ice." *Id.* (citing *Speakman*, 22 P.2d 488). The court of appeals reasoned: "To hold the City responsible for removing newly formed ice from the miles of sidewalks and streets before 7:55 a.m. would be unreasonable and impracticable." *Id.*

The court recognizes that *Lumbley* differs from this case because it involved municipal liability. But, the court finds its reasoning persuasive and concludes that the Kansas Supreme Court would apply it with equal force to the facts presented here. To hold that the United States had a duty to treat ice formed from snow melt refreezing overnight and causing Mr. Kaminski to fall at 5:00 a.m. would impose, in effect, a "24/7" duty for property owners to treat sidewalks during freezing weather. Kansas law seems utterly inconsistent with such a demanding burden.

Instead, defendant had a duty here to comply with the Bonner Springs Municipal Code. The snow removal ordinance required property owners to remove snow and ice from immediately adjacent public sidewalks "within 48 hours after cessation of a snow and ice event." Bonner Springs Municipal Code § 14-106(a) (2014). The ordinance does not define "snow and ice event." If this term means only snow or ice deposited naturally by a storm, the ordinance did not require defendant to remove ice formed from melting snow piles. But this construction of the ordinance is illogical because the ordinance's purpose is "to allow for safe pedestrian travel" on sidewalks. *Id.* So, the court concludes that the Bonner Springs ordinance is broad enough to include ice created by a melting and refreezing pile of snow. *Id.*

But not even this broader interpretation of the duty helps Mr. Kaminski's claim. His theory asserts that the snow piles melted on Sunday, February 24, refroze overnight when temperatures fell below freezing, and formed the "new" ice that caused his fall around 5:00 a.m.

24

on February 25.  If Mr. Kaminski fell on February 25, as he claims, defendant still was within the ordinance's 48 hour window to remove the ice from the sidewalk.  So, defendant never breached its duty.

But, as already explained, the court has found that Mr. Kaminski fell on Wednesday, February 27.  So the court must consider his theory that he fell on that date on ice produced by a pile of melting snow that defendant's employees had shoveled previously.  For this theory to be plausible, Bonner Springs' ordinance would have to accommodate more than one 48-hour clock.  The first clock would begin to run with "cessation of a snow and ice event."  Bonner Springs Municipal Code § 14-106(a) (2014).  A landowner who failed to remove snow from the sidewalk within the ensuing 48 hours would violate this code provision.

Likewise, under Mr. Kaminski's theory, a landowner could incur liability for failing to remove ice derived from water produced by melting snow that the landowner properly had removed from the sidewalk but later refroze, producing a new hazard.  When would that 48 hour clock start to run?  It wouldn't make sense for that clock to start at the "cessation of [the original] snow and ice event."  But would it begin when the melted snow first refreezes?  Or would it begin to run at some other refreezing event?  The Bonner Springs ordinance provides no answer to this complex series of interrelated questions.  And given the base proposition of Kansas common law—that a landowner need not do anything to remove snow from adjacent sidewalks—Kansas law does not authorize the court to invent an answer.

Finally, the court notes plaintiff's failure to adduce any evidence on these confounding questions.  For self-evident reasons, the evidence does not permit the court to conclude that Mr. Kaminski fell on refrozen snow melt or, if he did so, when the snow melt refroze on the

sidewalk.  As a consequence, the evidence provides no principled basis to apply the ordinance's

48-hour clock to Mr. Kaminski's apparent theory.

The court also finds that defendant must have a reasonable opportunity to remove the ice

that formed overnight, as the Kansas Court of Appeals held in *Lumbley*, before Kansas law can

impose a duty on it.  *Lumbley*, 2004 WL 324428, at *3 ("To hold the City responsible for

removing newly formed ice from the miles of sidewalks and streets before 7:55 a.m. would be

unreasonable and impracticable.").  Here, Mr. Kaminski fell on the sidewalk around 5:00 a.m.,

several hours before the Post Office opened for business and before one would expect customers

to travel the sidewalks to access the building.  Like *Lumbley*, the court concludes that holding

defendant responsible for removing newly formed ice from the sidewalks at 5:00 a.m. "would be

unreasonable and impracticable." *Id.*

The court also recognizes, however, that defendant's method of shoveling snow into piles

at the top of a sloping sidewalk may not offer the best practice for snow removal.  Indeed, it is

undisputed that water from these melting snow piles would travel across the sidewalk and into

the street to drain into the storm sewer.  So, the water draining from these piles could refreeze on

the sidewalk when temperatures dropped below freezing overnight.  But, again, defendant should

have a reasonable opportunity to remedy the ice formed by melting and freezing.  And, it is

unreasonable to place a duty on defendant to treat those icy conditions before 5:00 a.m.

In reaching this conclusion, the court is persuaded by the decisions of other courts

holding that no liability attaches when ice forms from the natural cause of melting snow.  *See*,

*e.g.*, *Land v. United States*, No. 94-4206, 1995 WL 508710, at *1 (10th Cir. Aug. 28, 1995)

(affirming summary judgment against a negligence claim because the landowner had no duty

under Utah law to remove ice from driveway when "moisture accumulation, thawing and

freezing, are inevitable in wintertime in Utah"); *LaFond v. United States*, 781 F.2d 153, 154 (8th Cir. 1986) (applying Minnesota law and holding that defendant had no duty to remove ice that formed on a sidewalk from melting snow piles because melting snow is a natural cause of icy conditions, not an artificial one for which defendant could be liable); *Riccitelli v. Sternfeld*, 115 N.E.2d 288, 290 (Ill. 1953) (applying Illinois law, recognizing that a landowner's "industry" in removing snow "is desirable, if not necessary," and holding that the landowner was not liable when he cleared snow and a pedestrian fell on ice formed from the natural runoff from the snow piles); *Buffa v. Dyck*, 358 N.W.2d 918, 919 (Mich. Ct. App. 1984) (holding under Michigan law "where an abutting property owner clears away snow from a public sidewalk and natural forces such as melting and freezing subsequently cause icy conditions, liability will not attach"). *Cf. Lain v. Johnson Cty. Comm. Coll.*, No. 13-CV-2201, 2013 WL 4052924, at *3 (D. Kan. Aug. 12, 2013) (holding that defendant was immune from liability under the Kansas Tort Claim Act because plaintiff slipped on ice that was the result of natural weather conditions (the melting and refreezing of snow from snow piles) and not caused by any "affirmative act" of defendant); *Owoyemi v. Univ. of Kan.*, 91 P.3d 552, 2004 WL 1373305, at *3 (Kan. Ct. App. June 11, 2004) (unpublished table opinion) (holding defendant's failure to remove snow from near the sidewalk where it could melt and refreeze was not an "affirmative act" rendering defendant liable under the Kansas Tort Claims Act and noting that "[s]uch a requirement would appear to impose an undue burden on the property owner").

The court also concludes that the lease agreement did not impose a duty on defendant to remove ice formed from melting snow piles at 5:00 a.m. when Mr. Kaminski fell. As discussed above, even if the lease agreement created a duty that defendant owed to Mr. Kaminski as a

third-party beneficiary, the duty owed is one of ordinary care.  And, for all the reasons discussed above, the evidence at trial failed to show that defendant breached a duty of ordinary care.

      **2.   No Evidence Exists Proving that Mr. Kaminski Fell on Ice that Formed From Water that Drained from the Northwest Downspout onto the Sidewalk.**

Finally, Mr. Kaminski argued that he fell on ice formed by water that had flowed out of the northwest downspout into the rear parking lot and then over the sidewalk.  Although Mr. Kaminski presented some evidence at trial that water would flow from the northwest downspout onto the sidewalk, he failed to prove that the water reached the area where he fell.  Thus, he has never provided the requisite evidence of causation needed to prevail on a negligence claim.

Mr. Kaminski testified that he parked his truck in the third or fourth parking space to the north East Second Street.  He got out of his truck on the driver's side, walked down the left side of the vehicle, and stepped over a snow ridge onto the sidewalk bordering East Second Street.  This is where Mr. Kaminski testified that he fell.

Photographs of the curb and sidewalk adjacent to the northwest downspout show that water exposure had caused disintegration and cracking of the concrete.  *See* Exs. 33-B, 33-D.  The sidewalk joint nearest the end of the curb has significant cracking and erosion.  *See* 33-B.  The next sidewalk joint to the southwest has no similar cracking or erosion.  *Id.*  David Nelson, a licensed professional engineer, testified that this damage shows that water flowed to the first sidewalk joint and drained down the joint to the street.

Where Mr. Kaminski alleges that he fell is not near the sidewalk joint with the significant and cracking and erosion—that is, the sidewalk joint where water drained down onto the sidewalk.  Exhibit 33 contains 24 pictures that Mr. Nelson took of the area.  The fifteenth picture

shows that the affected sidewalk joint intersects the middle of the fourth parking space.[10]  If Mr. Kaminski parked in the third parking space and stepped on the curb on the driver's side of his truck, he stepped several feet southwest of the affected sidewalk joint.  If Mr. Kaminski had parked in the fourth parking spot and stepped on the curb of the driver's side of his truck, he stepped several feet northeast of the affected sidewalk joint.  The evidence thus fails to show that Mr. Kaminski fell in an area where ice formed from water coming from the northwest downspout.

Also, to the extent Mr. Kaminski argues that the changes to the curb separating the rear parking lot and the sidewalk on East Second Street created a dangerous condition that allowed water from the downspout to drain onto the sidewalk, the court cannot hold defendant liable for those changes.  "The FTCA does not authorize suits [against the government] based on the acts of independent contractors or their employees."  *Curry v. United States*, 97 F.3d 412, 414 (10th Cir. 1996) (first citing *United States v. Orleans*, 425 U.S. 807, 814 (1976); then citing *Logue v. United States*, 412 U.S. 521, 527 (1973)).  Here, Mr. Welborn testified that he made the changes to the curb sometime in early 2012.  He hired a contractor to grind the curb down and pour fresh concrete over it.  USPS neither asked nor authorized this project, and Mr. Welborn never discussed the project with USPS.  So, the governing law will not permit liability under the FTCA for any changes made to the curb.  The court recognizes that the lease agreement obligated defendant to remove snow and ice from the sidewalks, and so, it had a duty to remove any ice that may have formed from water flowing from the northwest downspout onto the sidewalk.  But, as the court already concluded, Mr. Kaminski adduced no evidence to prove that ice that

---

[10]     The 24 pictures in Exhibit 33 are not individually marked.  The fifteenth photograph is taken directly in front of the fourth parking space.  A green Dodge Ram truck is parked in the fourth space—the one farthest to the north.  A white Ford F-150 truck is parked in the third parking space—one space to the south of the Dodge Ram.

formed from water flowing out of the northwest downspout *caused* his fall.  Mr. Kaminski thus has failed to prove a negligence claim.

**III.    Conclusion**

While the court regrets that Mr. Kaminski fell and injured himself, the court concludes that he has failed to carry his burden to prove that defendant was negligent under Kansas law. The court thus enters judgment for defendant.

**IT IS THEREFORE ORDERED** that the court finds for defendant, the United States of America, on the claim asserted by plaintiff Charles Kaminski, and that plaintiff takes nothing by way of judgment.  The court directs the clerk to enter judgment for defendant under Rule 58.

**IT IS SO ORDERED.**

**Dated this 1st day of December, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**